**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Dr. Penny M. Wilkie, | ) | **ORDER GRANTING DEFENDANT'S** |
| | ) | **MOTION FOR SUMMARY** |
| Plaintiff, | ) | **JUDGMENT/MOTION TO DISMISS** |
| | ) | |
| vs. | ) | |
| | ) | Case No. 4:07-cv-027 |
| Department of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |

Before the Court is the Defendant's "Motion for Summary Judgment/Motion to Dismiss,"
filed on January 29, 2010. See Docket No. 42. The Plaintiff filed a response in opposition to the
motion on March 1, 2010. See Docket No. 44. On March 9, 2010, the Defendant filed a reply brief.
See Docket No. 49. For the reasons set forth below, the Court grants the Defendant's motion.


I.      **BACKGROUND**

        The plaintiff, Dr. Penny M. Wilkie, began employment with the Quentin Burdick Memorial
Health Care Facility (Clinic) in Belcourt, North Dakota in January 2001 as the clinical director. The
defendant, the Department of Health and Human Services (Department), operates the Clinic. In
2003, Wilkie contends that Todd Bercier, the administrative officer and acting CEO at times, began
making sexually-suggestive comments to her. Wilkie testified that Bercier made a couple of
comments at work "like, oh, I've always thought you were attractive since high school, and making
reference to we should just go to like run off to Venezuela, . . ." See Docket No. 47, pp. 19-20.
Wilkie testified that in 2004, Bercier rubbed his foot against hers while they were in a meeting with
the CEO at the time, Linus Everling. Wilkie testified that she told Everling at the end of the meeting
about Bercier's behavior, and that "[h]e said he didn't witness or see anything, and he said if I didn't

put it in writing, then nothing -- it didn't happen." See Docket No. 47, p. 22. Wilkie did not submit a complaint in writing.

Wilkie testified that Bercier would call her at home while intoxicated. He came to her home unannounced on two or three different occasions in 2004. On one occasion in the fall of 2004, Wilkie came home and found Bercier sleeping in her bed naked with a red, sheer cloth over one of her lamps and a bottle of alcohol laying next to the bed. Wilkie testified that she slept on the sofa that night and woke Bercier up the next morning when his wife called wondering why he spent the night at Wilkie's. Later that morning, Bercier called the emergency room where Wilkie was working to apologize to her and Wilkie told him to "just forget it." See Docket No. 47, p. 29. Wilkie testified that she then told Bercier for the first time that his conduct was inappropriate and unwelcome. See Docket No. 47, p. 110. Wilkie said people in the community were calling her names because of this incident, but she did not report it because she was embarrassed. When asked whether she had any concerns for her own safety or well-being, Wilkie responded, "When he was coming to my home and how he got into my home, yeah I did." See Docket No. 47, pp. 25-26. Bercier never called Wilkie nor came to her home after that one evening in the fall of 2004. See Docket No. 47, p. 33. Wilkie testified that she spoke to several CEOs about Bercier being impaired at work but never mentioned anything about Bercier coming over to her home.

Wilkie testified that on July 20, 2005, Bercier withheld information from her relating to one of her subordinates (Dr. Plasse) taking pharmaceuticals from the emergency room. Wilkie said that Bercier told another subordinate (Dr. Earls) not to tell Wilkie because she and Dr. Plasse were having an affair and that Wilkie was under psychiatric care.

The record reveals that Wilkie first contacted an Equal Employment Opportunity (EEO) counselor on August 2, 2005. See Docket No. 20-4. When asked what actions she alleged as

constituting harassment in the EEO complaint, Wilkie responded: "When -- I think what really upset me is when [Bercier] didn't inform me that -- of missing pharmaceuticals from the emergency room that Dr. Plasse supposedly had taken, and [Bercier] had made comments to Dr. Earls not to tell me because I was having sexual relationships with Dr. Plasse." See Docket No. 47, p. 32. Bercier was acting CEO while the CEO at the time, LaVerne Parker, was absent from the Clinic. After filing the EEO complaint in August 2005, Wilkie testified that Bercier seemed hostile.

> Q. [Counsel for Wilkie]    Did you -- did you believe that [Bercier] was monitoring or stalking you at the clinic?
>
> A. [Wilkie]    For that week LaVerne was gone, yeah. It was -- made my life miserable.
>
> Q. [Counsel for Wilkie]    Well, describe what happened.
>
> A. [Wilkie]    Everything. To accusing me of being like hostile with the staff, accusing me of basically not doing my job, being incompetent, you know, just on me. I mean, you could -- I don't specifically remember everything, but, I mean, I did provide those e-mails.

See Docket No. 47, p. 34.

Bercier's alleged hostile conduct in August 2005 and thereafter included: (1) Bercier attended a medical staff meeting and made comments that Wilkie felt were confrontational to her and others; (2) Bercier questioned Wilkie about comments she had made to a co-worker; (3) Bercier contacted Wilkie about her inefficiencies monitoring physicians and the time it takes to transfer medical charts; and (4) Bercier referred patients with complaints regarding the pharmacy to Wilkie. Wilkie testified she "couldn't take it anymore" and was granted leave to see a counselor with the employee assistance program. See Docket No. 47, pp. 34-35.

On November 14, 2005, Wilkie sent CEO Parker an email that stated, "I have contacted Vina Bohling for a request for Transfer . . . I do not wish to leave this service unit as I have several ties to

3

the community, if things do no[t] change th[e]n I feel forced to leave." <u>See</u> Docket No. 43-5, p. 21. Wilkie said that CEO Parker told her she could arrange a transfer. <u>See</u> Docket No. 47, pp. 81-82.

On February 15, 2006, Dr. Plasse and Dr. Lau called a meeting of members of the medical staff to address Wilkie's position as clinical director. The previous clinical director had been removed by the medical staff. <u>See</u> Docket No. 47, p. 55. A vote of "no confidence" was held and the majority of the medical staff voted to remove Wilkie as clinical director. Wilkie contends that proper procedures for the vote were not used, and both Dr. Plasse and Dr. Lau undermined her authority by calling the meeting. Upon finding out about the vote of "no confidence", Wilkie immediately reported it to CEO Parker. <u>See</u> Docket No. 47, p. 56. After the vote of "no confidence", several doctors verbally complained to CEO Parker about Wilkie, and Parker sent Wilkie a letter regarding the complaints. CEO Parker also requested assistance from the human resources department in Aberdeen, South Dakota. Several staff members were interviewed regarding Wilkie's job performance. Around the same time period in February 2006, CEO Parker denied Wilkie leave to attend a continuing medical education course in Las Vegas. <u>See</u> Docket No. 47, pp. 67-69. During this time frame, Wilkie testified that she did not feel threatened or under any pressure from Todd Bercier. <u>See</u> Docket No. 47, p. 57. Wilkie said she did not know whether Bercier was involved in calling the meeting where the vote of "no confidence" was taken, and Wilkie acknowledged that Bercier did not participate in the meeting. <u>See</u> Docket No. 47, p. 57.

On March 17, 2006, Wilkie resigned for the following reasons:

> Well, there was many, many multiple reasons. A lot of my concern was with how I was being just basically brushed aside as clinical director and my responsibilities were not being seriously taken or being accused of not doing my job, which I still don't understand what I did wrong, and in how patient care was jeopardized by having administration bring providers into the facility that were never cleared by the medical staff, and yet I just don't understand how that could be just not looked at and taken seriously when you're dealing with patients. You just don't allow

4

somebody to walk in your facility and start working on human beings without having something in their file.

How I was brushed aside and not told about missing pharmaceuticals from the facility and this is a department that I'm responsible for. How administration could just totally ignore policies and procedures of our facility that are there for a reason to prevent chaos from happening and also to ensure that our facility is accredited with joint commission, Medicare/Medicaid services, and yet they can be totally ignored.

How biased the investigation was that only certain members of the medical staff were solicited for negative comments, and people that went to speak on my behalf were dismissed, and that was -- those conversations were never recorded or given to my supervisor. How --

See Docket No. 47, pp. 58-59. Wilkie testified that Bercier was, in part, one of the reasons she resigned. See Docket No. 47, p. 92. Wilkie reported the alleged harassing conduct that occurred in 2004 after she submitted her resignation in March 2006.

Wilkie filed a complaint in federal district court on April 2, 2007. See Docket No. 1. The Department filed a "Motion to Dismiss/Motion for Summary Judgment" on October 15, 2007. See Docket No. 17. On March 24, 2008, the Court issued an "Order Granting in Part and Denying in Part Defendant's Motion to Dismiss." See Docket No. 27. The Court granted the Department's motion to dismiss Wilkie's Title VII claim because the Court lacked subject matter jurisdiction due to Wilkie's failure to exhaust administrative remedies. The Court denied the Department's motion to dismiss as it related to the tort and constitutional claims and held such claims in abeyance pending a final decision from the Merit Systems Protection Board (MSPB).

On July 24, 2008, an administrative law judge for the MSPB issued an "Initial Decision." See Docket No. 43-7. The ALJ found that Wilkie failed to show that her resignation was involuntary, and dismissed Wilkie's appeal "as outside of the Board's appellate jurisdiction." See Docket No. 43-7. Wilkie filed a petition for review asking the MSPB to reconsider the initial decision issued by the ALJ. On October 22, 2008, the MSPB issued its "Final Order." See Docket No. 43-6, pp. 26-29.

5

The MSPB denied the petition for review and concluded "that there is no new, previously unavailable, evidence and that the administrative judge made no error in law or regulation that affects the outcome." See Docket No. 43-6, pp. 26-27.

On November 21, 2008, Wilkie filed a new complaint in federal district court (Case No. 4:08-cv-100, Docket No. 1), claiming she had exhausted her administrative remedies and reasserting the causes of action set forth in her original complaint. On December 11, 2008, the Court issued an order of consolidation in which the Court ordered that Case No. 4:07-cv-027 shall be the lead file. See Docket No. 29. The complaint contains six causes of action against the Department: (1) violation of the rights guaranteed to Wilkie by Title VII of the Civil Rights Act of 1964; (2) intentional infliction of emotional harm; (3) negligent infliction of emotional harm; (4) denial of Wilkie's First and Fourteenth Amendment rights; (5) defamation of Wilkie's character, and libel and slander to her personal and professional reputation; and (6) violation of Wilkie's rights as a whistle blower. See Docket No. 1.

In the present "Motion for Summary Judgment/Motion to Dismiss," the Department contends Wilkie's causes of action should be dismissed. See Docket No. 42. Specifically, the Department asserts that (1) Wilkie's Title VII claim should be dismissed because she has not met her burden of establishing a prima facie case of sex-based harassment/hostile work environment, gender-based discrimination, or retaliation, and that Wilkie did not plead or prove a constructive discharge cause of action; (2) the Court does not possess subject matter jurisdiction over Wilkie's second, third, and fifth causes of action; (3) Wilkie's second, third, fourth, and fifth causes of action are preempted by Title VII and the comprehensive procedural and substantive provisions available to her through her employer; and (4) Wilkie has not alleged facts sufficient to establish a cause of action under the whistle blower provisions of the False Claims Act.

6

On March 9, 2010, the Court issued an "Order Dismissing Plaintiff's Non-Title VII Claims." See Docket No. 48.  The only cause of action that remains is Wilkie's Title VII claims.

## II.    STANDARDS OF REVIEW

### A.    RULE 12(b)(1)

Rule 12(b)(1) of the Federal Rules of Civil Procedure mandates the dismissal of a claim if there is a lack of subject matter jurisdiction.  It is well-established that "a district court 'has authority to consider matters outside the pleadings when subject matter jurisdiction is challenged under Rule 12(b)(1).'"  Harris v. P.A.M. Transp., Inc., 339 F.3d 635, 637 n.4 (8th Cir. 2003) (quoting Osborn v. United States, 918 F.2d 724, 728 n.4 (8th Cir. 1990)).  Unlike a motion to dismiss under 12(b)(6), looking at matters outside the pleadings does not convert a Rule 12(b)(1) motion to a motion for summary judgment.  Harris, 339 F.3d at 637 n.4.  The Eighth Circuit has explained that the difference between the two rules "'is rooted in the unique nature of the jurisdictional question.'"  Osborn, 918 F.2d at 729 (quoting Williamson v. Tucker, 645 F.2d 404, 413 (5th Cir. 1981)).  "[A] district court has 'broader power to decide its own right to hear the case than it has when the merits of the case are reached.'"  Id.  Jurisdictional issues, whether they involve questions of law or fact, are for the court to decide.

### B.    RULE 56

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates no genuine issues of material fact exist and, therefore, the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(c).  Summary judgment is not appropriate if there are factual

disputes that may affect the outcome of the case under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.  Id.

The Court must inquire whether the evidence presents sufficient disagreement to require the submission of the case to a jury or if it is so one-sided that one party must prevail as a matter of law. Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party first has the burden of demonstrating an absence of genuine issues of material fact.  Simpson v. Des Moines Water Works, 425 F.3d 538, 541 (8th Cir. 2005).  The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e)(2).

"Motions for summary judgment in employment discrimination cases are scrutinized more carefully because of the inherently factual nature of the inquiry and the factual standards set forth by Congress." Henderson v. Ford Motor Co., 403 F.3d 1026, 1032 (8th Cir. 2005).  As such, "'summary judgment should seldom be used in employment-discrimination cases.'" Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1205 (8th Cir. 1997) (quoting Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994)).  "Nonetheless, 'summary judgment is proper when a plaintiff fails to establish a factual dispute on an essential element of her case.'"  Simpson, 425 F.3d at 542 (quoting EEOC v. Woodbridge Corp., 263 F.3d 812, 814 (8th Cir. 2001)).

### III.   LEGAL DISCUSSION

Wilkie contends the Department violated her Title VII rights (1) to be free of sexual harassment and gender discrimination; (2) to be free of a hostile work environment; (3) to equal treatment in her place of employment; (4) to enjoy the rights, privileges, and protections provided

to all employees by the hospital policies, medical staff by-laws, and all applicable state and federal laws and regulations; and (5) to be free of recrimination and retaliation in her place of employment as a result of her reporting of wrongdoing of others.

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "Employer" means "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year . . . . " 42 U.S.C. § 2000e(b). "Employee" means "an individual employed by an employer . . . . " 42 U.S.C. § 2000e(f). The parties do not dispute that the Department is an employer and Wilkie is an employee for purposes of Title VII.


A.    **EXHAUSTION OF ADMINISTRATIVE REMEDIES**

It is well-established that administrative remedies must be exhausted before a Title VII plaintiff can bring a discrimination claim. Bailey v. USPS, 208 F.3d 652, 654 (8th Cir. 2000). Under regulations promulgated by the Equal Employment Opportunity Commission (EEOC), federal employees complaining of discrimination by a governmental agency "must consult a[n EEO] Counselor prior to filing a complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a). Such persons "must initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory." Id. § 1614.105(a)(1). Even though it does not carry the full weight of statutory authority, failure to comply with the 45-day time limit has been held to be fatal to a federal employee's discrimination claim. See, e.g., Bailey, 208 F.3d at 655 (finding that the

plaintiff failed to exhaust her administrative remedies because her written request for EEO counseling occurred approximately three months after the expiration of the 45-day period); see also 29 C.F.R. § 1614.107(a)(2) (agency generally must dismiss claims of violations outside the 45-day period). However, the 45-day time limit "shall" be extended when:

> the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, that he or she did not know and reasonably should not have been known that the discriminatory matter or personnel action occurred, that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission.

29 C.F.R. § 1614.105(a)(2).

The Department contends that Wilkie's Title VII claims based on discriminatory acts that took place in 2004 should be dismissed because Wilkie failed to initiate contact with an EEO counselor within 45 days of the incidents.   Wilkie contends that equitable tolling is justified under the exceptions to the 45-day time limit.

Wilkie offered no evidence that she was unaware of the 45-day time limit or that she had no knowledge that the alleged 2004 harassment by Bercier had occurred.  The 45-day time limit is discussed in a memo dated March 22, 2004, addressed to "All IHS Employees" from the Director of Indian Health Service.  See Docket No. 49-1.  As the clinical director, Wilkie had EEO responsibilities which required her to ensure that medical staff were aware of the EEO programs.  See Docket No. 49-2.

Wilkie argues she did not promptly inform an EEO counselor, her employer, or law enforcement of the 2004 incidents because she was embarrassed, depressed, afraid of Bercier, and scared she would lose her job.  See Docket No. 46.  Dr. Kathleen Hughes-Kuda, the former staff psychologist in Belcourt and former roommate of Wilkie, testified that Wilkie "seemed pretty

10

stressed and depressed" during the time period between 2003 and 2005.  See Docket No. 47, p. 138.

"[A] plaintiff seeking tolling on the ground of mental incapacity must come forward with evidence

that a mental condition prevented him from understanding and managing his affairs generally and

from complying with the deadline he seeks to toll."  Jessie v. Potter, 516 F.3d 709, 715 (8th Cir.

2008).  The Court finds that Wilkie has not met the standard required for tolling based on the grounds

of mental incapacity.

　　　　Wilkie said she believed that she would be written up if she complained in 2004 because of

her experience a few years earlier reporting a different incident by a different colleague.[1]  However,

Wilkie did contact an EEO counselor just a few weeks after the alleged July 20, 2005 discriminatory

conduct but never mentioned Bercier's misconduct in 2004.  The Court finds as a matter of law that

the tolling exception under 29 C.F.R. § 1614.105(a)(2) does not apply.

　　　　Wilkie also argues that the incidents involving Todd Bercier in 2004 are not time-barred

because her claims are based on a continuing violation that did not end until she resigned in March

2006.  The Supreme Court has held:

> a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must
> file his charge within the appropriate time period . . . A charge alleging a hostile work
> environment claim, however, will not be time barred so long as all acts which
> constitute the claim are part of the same unlawful employment practice and at least
> one act falls within the time period.

Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002); see Betz v. Chertoff, 578 F.3d 929,

937-38 (8th Cir. 2009) (applying the same standard to the 45-day time period in 29 C.F.R. §

---

[1]In her deposition taken on September 15, 2009, Wilkie testified that she had filed an EEO complaint in 2001 or 2002 regarding derogatory comments made to her by a Dale Buckles.  See Docket No. 43-9, pp. 67-68. Wilkie testified that the CEO at the time made it sound like they were possibly going to write Wilkie up "because we had a shouting match.  That's how it was going to be addressed and not, you know, address his comments that he made.  Because basically he said it was my word against his."  See Docket No. 43-9, pp. 69-70.  Wilkie did not receive any reprimand in her file regarding the incident.  Wilkie does not know whether Buckles received a reprimand.

1614.105(a)); Lyons v. England, 307 F.3d 1092, 1106 n.6 (9th Cir. 2002) ("Although the circumstances in which 29 C.F.R. § 1614.105(a)(1) may be equitably tolled are no doubt broader than the tolling opportunities under [42 U.S.C. § 2000e-5(e)], we find that the mandatory nature of the federal regulation is sufficient to warrant full application of the Morgan rule.").

"A discrete retaliatory or discriminatory act 'occurred' on the day that it 'happened'" and is barred if not filed within the applicable time period, even if it is related to acts alleged in timely-filed charges. Morgan, 536 U.S. at 110, 113; see Betz, 578 F.3d at 938. However, the repeated nature of hostile work environment claims makes them different in kind from discrete acts. "Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." Morgan, 536 U.S. at 117. Even if there is a time period of more than 45 days between acts that contribute to a hostile work environment, it does not prohibit the plaintiff from claiming those earlier acts because "a hostile work environment constitutes one 'unlawful employment practice.'" Id. at 118. However, if the later act that falls within the time period has no relation to the earlier acts, or for some other reason was no longer part of the same hostile work environment claim, then the employee cannot recover for the previous acts.

The Eighth Circuit Court of Appeals addressed the *Morgan* rule in Rowe v. Hussmann Corp., 381 F.3d 775 (8th Cir. 2004). In Rowe, the same individual committed harassing acts both before and after the limitations period, and there was evidence that the employer was made aware of the harassment. The Eighth Circuit held "as a matter of law that the acts before and after the limitations period were so similar in nature, frequency, and severity that they must be considered to be part and parcel of the hostile work environment that constituted the unlawful employment practice that gave rise to this action." Rowe, 381 F.3d at 781.

12

The Court finds that the misconduct of Bercier in 2004 was not "so similar in nature, frequency, and severity" as to be part and parcel of the hostile work environment that may have existed after July 2005, and which gave rise to this action.  While the individual involved in the 2004 and 2005 incidents was Todd Bercier, the conduct was very different and the Department was not made aware of the 2004 incidents until after Wilkie resigned.[2]  The alleged harassment in 2004 – Bercier coming over to Wilkie's home while intoxicated, making comments regarding the two of them dating, playing footsie with Wilkie and pointing a laser at her inappropriately, and entering Wilkie's home and passing out naked in her bed – was far more egregious than the incidents which are alleged to have occurred after July 2005.  Further, Wilkie testified that Bercier's sexual comments towards her ended after 2004, and she did not feel threatened or pressured in any manner by Bercier after that.

The same is true with the charges of harassment that occurred after August 2, 2005, the date Wilkie first contacted the EEO counselor – namely that Bercier attended a medical staff meeting and made confrontational comments to Wilkie regarding a work issue; Bercier contacted Wilkie about inefficiencies involved with her supervision; Bercier referred patients with pharmacy complaints to Wilkie; and the circumstances surrounding the "no confidence" vote by the medical staff.  Wilkie admits that all of Bercier's conduct after August 2, 2005 fell within the scope of his job duties, but Wilkie contends that he had never previously engaged in such conduct.  Wilkie also acknowledged that Bercier, to her knowledge, had nothing to do with the vote of "no confidence".

---

[2] Wilkie contends that Linus Everling, the CEO of the Clinic in 2004, was aware of the alleged harassing conduct in 2004.  Wilkie testified that she told Everling that Todd Bercier was playing footsie with her and pointing a laser at her inappropriately in 2004 in Everling's office.  Wilkie further testified that Everling told her to put it in writing, which she did not do.  The Court finds that this is not sufficient to raise a material question of fact regarding whether the Department knew of the harassment in 2004 before Wilkie resigned.

The Court finds that the 2004 incidents of misconduct have no connection to the conduct that occurred in July 2005 and thereafter, and the tolling exceptions to the 45-day time limit do not apply. The Court further finds as a matter of law that Wilkie failed to exhaust her available administrative remedies with respect to the alleged misconduct that occurred before June 18, 2005 which was 45 days prior to Wilkie's first contact with an EEO counselor. As a result, the Court lacks subject matter jurisdiction over conduct that occurred before June 18, 2005. The Department's motion to dismiss such claims is granted pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

### B.   HOSTILE WORK ENVIRONMENT/SEXUAL HARASSMENT

"'Sexual discrimination that creates a hostile or abusive work environment is a violation of Title VII of the Civil Rights Act of 1964.' A hostile work environment 'arises when sexual conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.'" Vajdl v. Mesabi Acad. of KidsPeace, Inc., 484 F.3d 546, 549-50 (8th Cir. 2007) (quoting Hall v. Gus Constr. Co., Inc., 842 F.2d 1010, 1013 (8th Cir. 1988)). A claim of hostile work environment requires "a high evidentiary showing that the plaintiff's workplace is 'permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Vajdl, 484 F.3d at 550 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

Wilkie's hostile work environment/sexual harassment claim is evaluated under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Erenberg v. Methodist Hosp., 357 F.3d 787, 792 (8th Cir. 2004). Under this framework, Wilkie bears the initial burden of establishing by a preponderance of the evidence a prima facie case of hostile work

14

environment.  Once this showing is made, the burden then shifts to the Department to articulate a legitimate, non-discriminatory reason for its actions.  If the Department offers such a reason, the burden then shifts back to Wilkie to establish by a preponderance of the evidence that the Department's reason is in reality a pretext for unlawful discrimination.

To establish a prima facie case for hostile work environment, Wilkie is required to show:  (1) that she is a member of a protected class; (2) that she was subjected to unwelcome harassment; (3) that the harassment was based on gender; (4) that the harassment affected a term, condition, or privilege of her employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt remedial action.  Vajdl, 484 F.3d at 550.  The standard for a hostile work environment claim is relatively stringent:

> Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

Woodland v. Joseph T. Ryerson & Son, Inc., 302 F.3d 839, 843 (8th Cir. 2002) (quoting Harris, 510 U.S. at 21-23).  "Merely offensive conduct is not enough absent the requisite effect on the terms or conditions of employment.  Title VII does not 'impose a code of workplace civility.'"  Woodland, 302 F.3d at 843 (quoting Palesch v. Mo. Comm'n on Human Rights, 233 F.3d 560, 567 (8th Cir. 2000)).

First, Wilkie must establish that she is a member of a protected class.  There is no dispute that Wilkie, a female, is a member of a protected class.

Second, Wilkie must show that she was subjected to unwelcome harassment.  As noted, the alleged misconduct that occurred before June 18, 2005 is time-barred.  Wilkie testified that she learned that Bercier had instructed an employee not to inform her that another physician was taking

pharmaceuticals without authorization, and Bercier expressed the opinion that Wilkie was having an affair with that physician and she was under psychiatric care.   Wilkie contends Bercier had supervisory authority over her as the acting CEO at the time.   In this supervisory role, Bercier attended a medical staff meeting and made comments to Wilkie regarding a work issue and contacted her about inefficiencies involved with her supervision of the medical staff.   CEO Parker also disallowed Wilkie's request to attend a continuing medical education course in Las Vegas.   Wilkie argues that the vote of "no confidence" by the medical staff subjected her to unwelcome harassment.

Third, Wilkie must establish that the harassment was based on gender.   In her affidavit, Wilkie contends Bercier's misconduct in 2004 was based on her being a female, but makes no mention of how the actions that occurred June 18, 2005 and thereafter were based on her gender.   See Docket No. 46.   As previously noted, the 2004 incidents of misconduct on the part of Bercier are time-barred.   Wilkie has not shown that the delay in reporting the unauthorized removal of pharmaceuticals by a staff physician was motivated by gender discrimination, that Bercier's attendance at a staff meeting and his emails regarding work-related problems were motivated by sex discrimination, that those who organized the staff meeting to remove her as clinical director did so because they did not want a woman performing the tasks, or that CEO Parker was motivated by gender-bias when she denied Wilkie's request to attend continuing medical training in Las Vegas. However, a rumor of a person having an intimate relationship with another is sexual in nature and can show that the harassment was based upon gender.   See McDonnell v. Cisneros, 84 F.3d 256, 259-60 (7th Cir. 1996); see also Jew v. Univ. of Iowa, 749 F. Supp. 946, 958-59 (S.D. Iowa 1990) (finding that rumors of the plaintiff having a sexual relationship with her supervisor were based on the plaintiff being a woman).

Fourth, Wilkie must establish that the alleged discriminatory conduct affected a term, condition, or privilege of her employment.  In order to satisfy this factor, Wilkie must show that the conduct was so severe "as to create an *objectively* hostile work environment that altered the terms, conditions, or privileges of employment."  Willis v. Henderson, 262 F.3d 801, 808 (8th Cir. 2001) (emphasis in original).  To determine whether alleged harassment affected a term, condition, or privilege of Wilkie's employment, the Court must consider the totality of the circumstances "'"including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Cottrill v. MFA, Inc., 443 F.3d 629, 636 (8th Cir. 2006) (quoting Faragher v. City of Boca Raton, Fla., 524 U.S. 775, 787-88 (1998)).  "While a single harassing act might not be actionable standing alone, it can be actionable as a constituent element of a larger hostile environment claim."  Engel v. Rapid City Sch. Dist., 506 F.3d 1118, 1124 (8th Cir. 2007).  "To be actionable, the conduct complained of must be extreme in nature and not merely rude or unpleasant."  Nitsche v. CEO of Osage Valley Elec. Coop., 446 F.3d 841, 846 (8th Cir. 2006).  While spreading a rumor about Wilkie having an affair with one of the staff physicians can be seen as based on her gender, that single act of discriminatory conduct is not so severe as to create an objectively hostile work environment that altered the terms, conditions, or privileges of her employment.

Fifth, Wilkie must establish that the Department knew or had reason to know that she was being sexually harassed and failed to take prompt remedial action.  The record reveals that Wilkie failed to inform her employer about any of the alleged discriminatory conduct that occurred in 2004 until _after_ she left the clinic in March 2006.

In carefully considering the entire record and the totality of the circumstances, which includes a review of the entire transcript of the administrative hearing before the MSPB, the Court finds the

17

allegations of discriminatory conduct that occurred June 18, 2005 and thereafter fail to raise a genuine issue of material fact as to hostile work environment/sexual harassment. The Quentin Burdick Memorial Health Care Facility in Belcourt is certainly not a model work environment. CEOs and clinical directors, both male and female, are frequently removed from office. The conduct of some of the medical staff appears to be dysfunctional at best. The conduct of Todd Bercier can best be described as juvenile, Neanderthal, devoid of any common sense or civility, and unprofessional. A review of the entire record would convince anyone that Bercier should have been terminated long ago as his value as a supervisor in modern times is highly questionable. However, Title VII does not impose a code of workplace civility. Wilkie has failed to establish a prima facie case for a hostile work environment, and summary judgment is warranted on this claim.

### C.   CONSTRUCTIVE DISCHARGE

Wilkie's complaint alleges hostile work environment but makes no mention of constructive discharge. However, on March 10, 2006, Wilkie sent CEO Parker a letter that stated, "I am submitting this letter as formal notification of constructive discharge . . . ." See Docket No. 43-5, p. 12. Constructive discharge and hostile work environment claims have different elements and "may be wholly distinct causes of action under Title VII." Winspear v. Cmty. Dev., Inc., 574 F.3d 604, 607 (8th Cir. 2009) (finding that the plaintiff, at most, made a constructive discharge allegation in addition to, not in lieu of, her original hostile work environment claim). A claim for constructive discharge requires more than a claim for hostile work environment. "To make out a case of constructive discharge, [Wilkie has] to show that a reasonable person would have found her working conditions intolerable, and that [Bercier or other members of the Department] intended to make her resign or, at a minimum, that her resignation was reasonably foreseeable given the conditions under

18

which she was working." <u>Betz</u>, 578 F.3d at 936 (citing <u>Reedy v. Quebecor Printing Eagle, Inc.</u>, 333 F.3d 906, 910 (8th Cir. 2003)).

Wilkie bases her constructive discharge claim on the same allegations the Court found insufficient to establish a hostile work environment claim.  As such, her claim for constructive discharge fails as well.  <u>See</u> <u>O'Brien v. Dep't of Agric.</u>, 532 F.3d 805, 811 (8th Cir. 2008) (finding that summary judgment on constructive discharge claim was appropriate where the plaintiff made the same allegations as in his failed hostile work environment claim).

### D.   <u>SEX DISCRIMINATION</u>

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  Wilkie's sexual discrimination claim is also analyzed under the burden-shifting framework set forth in <u>McDonnell Douglas</u>.  <u>Erenberg</u>, 357 F.3d at 792.   To establish a prima facie case of Title VII sexual discrimination, Wilkie must establish that she (1) is a member of a protected class; (2) was qualified to perform her job; (3) suffered an adverse employment action; and (4) was treated differently than similarly-situated employees who were not members of the protected class. <u>Philip v. Ford Motor Co.</u>, 413 F.3d 766, 768 (8th Cir. 2005).

The Court has determined that Wilkie is a member of a protected class.  While there was testimony to the contrary at the MSPB hearing regarding Wilkie's job performance, the parties do not seem to dispute that Wilkie was qualified to perform her duties as clinical director.  CEO Parker testified that she would have preferred to have Wilkie remain at the clinic.  <u>See</u> Docket No. 47, pp.

261-62.  There is a dispute concerning whether Wilkie suffered an adverse employment action and whether she was treated differently than similarly-situated male employees.

"A prima facie case of discrimination requires the employee to present evidence of an adverse employment action brought on by the employer's discriminatory motive."  MacGregor v. Mallinckrodt, Inc., 373 F.3d 923, 927-28 (8th Cir. 2004).  "Adverse employment actions must have a 'materially adverse impact' on the plaintiff's terms or conditions of employment under Title VII." Sowell v. Alumina Ceramics, Inc., 251 F.3d 678, 684 (8th Cir. 2001) (quoting Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1245 (8th Cir. 1998)).  This may include "'termination, cuts in pay or benefits, and changes that affect an employee's future career prospects' as well as 'circumstances amounting to a constructive discharge.'"  Clegg v. Ark. Dep't of Corr., 496 F.3d 922, 926 (8th Cir. 2007) (quoting Higgins v. Gonzales, 481 F.3d 578, 584 (8th Cir. 2007)).  However, "'[m]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not' rise to the level of an adverse employment action."  Id. Actions that cannot be deemed adverse include "changes in the terms, duties, or working conditions that cause no materially significant disadvantage to the employee; an employer's demand, which was later withdrawn with no impact on employee's continued employment, that an employee take a drug test; or disappointment with changes in one's employment situation."  Sowell, 251 F.3d at 684. Before resigning, the employee must allow the "employer a reasonable opportunity to work out a problem."  Id. at 685.

It is undisputed that Wilkie was not terminated.  There was no cut in her pay or benefits and no change in her job duties and responsibilities.  The Court has found that Wilkie's allegations do not raise a genuine issue of material fact as to whether she was constructively discharged.  There is no evidence that Wilkie was treated differently than similarly-situated males.  Both male and female

20

clinical directors and CEOs have been plagued with working in an unpleasant environment.  The CEO at the time Wilkie resigned was female.  Wilkie does not contend that the events which occurred June 18, 2005 and thereafter would not have occurred if the clinical director were a male.  Accordingly, the Court finds that Wilkie has failed to present a prima facie case of gender discrimination under Title VII and summary judgment is granted on this claim.

### E.    RETALIATION

It is well-established that Title VII's anti-retaliation provision prevents employers from retaliating against employees who have acted to vindicate their statutorily-protected rights by reporting harassment or discrimination in the workplace.  Brannum v. Mo. Dep't of Corr., 518 F.3d 542, 547 (8th Cir. 2008).  To analyze a retaliation claim under Title VII, the McDonnell Douglas three-part burden-shifting analysis is again applied.  See Erenberg, 357 F.3d at 793.  To establish a prima facie case of Title VII retaliation, Wilkie must demonstrate that "1) she engaged in protected conduct; 2) a reasonable employee would have found her employer's retaliatory action materially adverse; and 3) the materially adverse action was causally linked to her protected conduct."  Devin v. Schwan's Home Serv., Inc., 491 F.3d 778, 785 (8th Cir. 2007) (citing Higgins, 481 F.3d at 589).

First, Wilkie must show that she engaged in protected conduct by either opposing an act of discrimination or participating in an investigation under Title VII.  To satisfy this element, a "plaintiff need only report the alleged wrongful activity.  There is no additional requirement that the plaintiff report the perceived failure of the company to take proper remedial action."  Green v. Franklin Nat'l Bank of Minneapolis, 459 F.3d 903, 914 (8th Cir. 2006).  Protected activity includes "'an informal or formal complaint about, or other opposition to, an employer's practice or act . . . if the employee

21

reasonably believes such an act to be in violation of the statute in question.'" <u>Jeseritz v. Potter</u>, 282 F.3d 542, 548 (8th Cir. 2002) (quoting <u>Sherman v. Runyon</u>, 235 F.3d 406, 409 (8th Cir. 2000)).

It is undisputed that Wilkie first contacted an EEO counselor on August 2, 2005. When asked what actions she alleged as harassing in the EEO complaint, Wilkie responded, "When -- I think what really upset me is when [Bercier] didn't inform me that -- of missing pharmaceuticals from the emergency room that Dr. Plasse supposedly had taken, and [Bercier] had made comments to Dr. Earls not to tell me because I was having sexual relationships with Dr. Plasse." <u>See</u> Docket No. 47, p. 32. The Court finds that Wilkie has arguably satisfied the "protected conduct" requirement when she submitted a complaint to the EEO counselor.

Second, Wilkie must establish that a reasonable employee would have found her employer's retaliatory action materially adverse. In other words, the alleged retaliatory action "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" <u>Vajdl</u>, 484 F.3d at 552 (quoting <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548 U.S. 53, 68 (2006)). "'An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience.'" <u>Clegg</u>, 496 F.3d at 929 (quoting <u>Carpenter v. Con-Way Cent. Express, Inc.</u>, 481 F.3d 611, 619 (8th Cir. 2007)); <u>see Vajdl</u>, 484 F.3d at 552 ("'normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence'"); <u>Devin</u>, 491 F.3d at 785-87 (finding that trivial harms resulting from retaliatory behavior do not meet this standard).

Wilkie argues that many of the acts claimed to be discriminatory were done in retaliation for her complaints. These include Bercier attending a medical staff meeting and making comments which Wilkie felt were confrontational to her and others; Bercier questioning Wilkie about comments she made to a co-worker; Bercier contacting Wilkie about inefficiencies involved with a physician

monitoring the time it takes to transfer medical charts; and Bercier referring patients with complaints regarding the pharmacy to Wilkie. However, Wilkie acknowledged that all of these alleged discriminatory actions fell within the scope of Bercier's job duties and responsibilities. Wilkie further contends that Dr. Plasse and other staff physicians who disliked her retaliated by soliciting, organizing, and structuring a vote of "no confidence" at a meeting of the medical staff. However, according to Wilkie, neither Bercier nor any of her superiors had anything to do with scheduling the meeting. Wilkie also contends that CEO Parker denied her leave to attend a continuing medical education course in Las Vegas and Parker attempted to facilitate Wilkie's request for a transfer.

The Court finds that the conduct that allegedly occurred after Wilkie complained to the EEO counselor in August 2005 are minor in nature and do not meet the significant harm standard required. See Clegg, 496 F.3d at 929 (finding that failing to provide training and orientation, denying access to needed employment tools, failing to reinstate to prior position, interfering with authority, unfairly adding negative reports and reprimands to personnel file, treating differently than co-workers, excluding from meetings, giving negative evaluation, denying training, and adding days to a training assignment at a different unit were "at most trivial, failing to meet the significant harm standard set forth in Burlington Northern"). The Court further finds that Wilkie has failed to show that a reasonable employee would have been dissuaded from making or supporting a charge of discrimination based upon these allegations of retaliatory behavior.

Third, Wilkie must establish that the materially adverse employment action was causally related to her involvement in the protected activity. In other words, Wilkie must show that the conduct that occurred in August 2005 and thereafter was a result of her reporting the incidents to the EEO counselor. "[M]ore than temporal proximity is needed to show a causal link between the [adverse employment action] and the filing of the EEOC complaint." Wallace v. Sparks Health Sys.,

415 F.3d 853, 859 (8th Cir. 2005).  Even if Wilkie could show a causal connection between her report to the EEO counselor and the alleged discriminatory conduct that occurred in August 2005 and thereafter, she has failed to establish that a material adverse action occurred.

The Court finds that Wilkie has failed to establish a genuine issue of material fact that her employer retaliated against her for complaining of gender harassment.  Summary judgment is granted on this claim.


IV.   **CONCLUSION**

For the reasons set forth above, the Court **GRANTS** the Defendant's Motion to Dismiss (Docket 42), **GRANTS** the Defendant's Motion for Summary Judgment (Docket 42), and **DENIES AS MOOT** the Defendant's "Motion to Exclude Wilkie's Expert Witnesses" (Docket No. 50) and the Defendant's Motion in Limine (Docket No. 52).

Dated this 26th day of March, 2010.

*/s/  Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court